**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Darren Starr

     v.                                          Civil No. 06-cv-487-PB

Cpl. Timothy Coulombe, et al.[1]

**O R D E R**

     Darren Starr, an inmate at the Northern New Hampshire Correctional Facility ("NCF") has filed this action, pursuant to 42 U.S.C. § 1983, alleging that his First and Fourteenth Amendment rights have been violated by defendants' actions in causing a December 2003 seizure of Starr's incoming mail, and by events that occurred subsequent to that seizure.  As fully explained herein, I find that Starr's complaint states claims upon which relief may be granted, and I direct service of the complaint upon the defendants named therein.

---

[1]Starr names the following defendants, all employees of the New Hampshire Department of Corrections ("DOC") to this action: Cpl. Timothy Coulombe, John Vinson, the attorney for the DOC Commissioner, Northern New Hampshire Correctional Facility ("NCF") Warden Bruce Cattell, counselor C. Greenwood, Unit Manager Robert Thyng, Unit Manager Clough, Ed Redmond, Unit Manager Walsh, Corrections Officer Pidgeon.

<u>Standard of Review</u>

Under this Court's local rules, when an incarcerated plaintiff commences an action pro se and in forma pauperis, the magistrate judge must conduct a preliminary review to determine whether the complaint or any portion thereof should be dismissed because:

> (i)the allegation of poverty is untrue, the action is frivolous, malicious, or fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief under 28 U.S.C. § 1915A(b); or
>
> (ii) it fails to establish subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).

LR 4.3(d)(2).  In conducting the preliminary review, the Court construes pro se pleadings liberally in favor of the pro se party.  <u>See</u> <u>Cooper v. Chao</u>, 71 Fed.Appx. 76, 77 (1st Cir. 2003); <u>Ayala Serrano v. Lebron Gonzales</u>, 909 F.2d 8, 15 (1st Cir. 1990) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976)).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled." <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997), <u>cert. denied</u>, <u>Ahmed v. Greenwood</u>, 522 U.S. 1148 (1998).

At this preliminary stage of review, all factual assertions made by the plaintiff and inferences reasonably drawn therefrom must be accepted as true.  See <u>Aulson v. Blanchard</u>, 83 F.3d 1, 3 (1st Cir. 1996) (stating the "failure to state a claim" standard of review and explaining that all "well-pleaded factual averments," not "bald assertions," or "unsupportable conclusions" must be accepted as true).  This review ensures that pro se pleadings are given fair and meaningful consideration.

<u>Background</u>

In December of 2003, Trina Catalino, a non-inmate, mailed a letter to Darren Starr, an inmate at NCF.  Accompanying the letter were loose pages that Catalino had printed from the internet.  The printed pages contained copies of certain New Hampshire statutes.  Starr states that the pages were sent at his request, and were intended for use in preparing litigation. Starr asserts that the statutes sent were obviously related to the preparation of litigation because they dealt specifically with "Correction and Punishment," <u>see</u> N.H. Rev. Stat. Ann. ("RSA") § 622, <u>et</u> <u>seq.</u>, the "Department of Corrections," <u>see</u> RSA § 21-H, and rules of the State Nursing Board adopted pursuant to the state's Administrative Procedure Act, RSA § 541-A.  Starr was

known by NCF officials to be a litigious inmate, and it is
reasonable to assume that, if Starr received in the mail copies
of laws about the authority and responsibilities of the DOC and
its employees, that NCF staff members who knew of that mailing
would have identified the printed statutes as likely intended for
use in litigation.

The pages in question were unbound, and all of them fit
inside a single envelope.  Defendant Coulombe, an NCF mailroom
employee, seized the envelope from Catalino and notified Starr in
writing that it would be sent to the NCF's Literary Review
Committee ("LRC").  The LRC is a group that, according to DOC
policy, is made up of three prison officials, a member of the
security staff, a member of the mental health staff, and a member
of the educational staff.  The LRC is charged with evaluating
mail sent to inmates and identified by the mailroom staff as
possibly inappropriate, to determine whether all or part of the
mailing should be forwarded to the intended inmate recipient,
destroyed, returned to the sender, or otherwise handled.

On February 18, 2004, the LRC met to review the mail that
was withheld from Starr on December 23, 2003.  The members of the
LRC on that occasion were defendants Clough, Redmond, Pidgeon,
Walsh, and Coulombe.  Starr alleges that the LRC that was

convened to review his mail had more than three members, did not include any member of the educational staff, and included at least three members of the security staff, all in violation of written prison policy governing the makeup and function of the LRC.

On February 21, 2004, Starr received a notice, dated February 19, 2004, that because he had received a "large quantity of internet printouts," in violation of the "Publisher's Only" rule, his mail had been rejected and would not be forwarded to him.  That notice also advised Starr that he had ten days to appeal the decision of the LRC, and that after ten days, if no appeal were taken, the mail would be returned to the sender at Starr's expense.  The document also had a box checked next to the statement: "Any material that contains contraband as defined by this policy or other regulations," indicating that, as rejected mail, Starr's letter would now be considered contraband by NCF officials.

The LRC decision was also accompanied by another document entitled "5 Day Notice," which, contrary to the LRC denial notice, advised Starr that the "excess/unauthorized mail/property" in question had to be removed from the NCF within five days of the date of the notice, or the property would be

considered to be contraband.  No specific disposition of property
deemed to be contraband is stated in the 5 Day Notice.  The 5 Day
Notice refers to DOC Policy and Procedure Directive ("PPD") 9.2,
which governs the "Issuance and Control of Resident Property."
PPD 9.2 does not specifically authorize the 5-Day notice to be
sent for rejected incoming mail, nor does PPD 9.2 specify how
incoming mail that is rejected or determined to be contraband
should be managed.[2]

Starr states that due to a delay in obtaining access to the
prison's law library, he was unable to respond to the notice
until February 26, 2004.  On that date, Starr put an appeal of
the LRC decision, directed to the NCF Warden, into the prison
mail box located on his housing unit.  Starr put the appeal in
the box prior to the time when daily mail pick-ups are supposed
to occur.  The mail was not removed from the box by any prison
official until March 1, 2004.  The Warden did not receive Starr's
appeal until March 2, 2004.  The Warden responded to Starr that
because he had failed to pursue an appeal within five days of the

---

[2]I reviewed the version of PPD 9.2 effective at the time of
the events of which Starr complains.  I understand that the PPD
has since been supersede by PPD 9.02 (eff. Sept. 1, 2005).  I
note that the superseding version of the PPD does not contain any
reference to a 5 Day Notice being an appropriate response to
rejected incoming mail.

issuance of the 5 Day Notice, the internet printouts and the
personal letter that the printouts were sent with had been
destroyed.[3]  The appeal was, therefore, denied, as Cattell was
not able to examine and evaluate the materials in question or the
validity of the LRC's decision.

Starr filed a first-level grievance regarding the
destruction of the letter and printouts.  The grievance was, as
Starr's appeal had been, thorough and detailed as to what items
were sent and rejected, and the basis for Starr's objection to
the denial of his mailed material.  Defendant Thyng denied the
grievance on the grounds that Starr did not appeal the decision
of the LRC in time.

Starr filed a second-level grievance with Warden Cattell.
Again, the grievance was thorough and detailed with regard to the
facts alleged and legal theories and cases Starr asserted in
support of his position.  Cattell denied Starr's grievance,
stating that "by the time [Starr] got around to sending [his]
appeal the items had been destroyed."  Cattell stated that
because Starr had failed to make arrangements to have the

---

[3]The Warden erroneously stated in his denial of the appeal
that Starr "apparently took no action" on the LRC decision until
March 2, 2004.

documents sent out of the prison by February 24, 2004, the items were destroyed.

Starr filed a third-level grievance, as thorough as its predecessors in explaining exactly what steps he had taken to protest the destruction of his mail, and how his conduct had comported with prison policy to the extent possible, with the office of the DOC Commissioner.  John Vinson, the Commissioner's attorney, responded to that grievance as follows:

> Let me see if I understand this.  You got a 5-day
> notice.  You ignored it.  You did not ask that it be
> held in abeyance until you appealed.  You then waited
> to appeal until at least the 7th day.  Then you claim
> some violation of your rights.  The warden's response
> is sustained.

Starr asserts that the prison officials considering his appeal and grievance filings disregarded the fact that Starr should never have been given a 5 Day Notice, that he was provided with an appropriate form that allowed for a ten day window for Starr to respond to the LRC decision, that nowhere was Starr advised in either notice, both of which are attached to the complaint, that a failure to respond within five days would cause an automatic destruction of the mailing in question.  Further, Starr states that to the extent that Starr's filings may have been untimely, if examined for compliance with the five-day rule,

8

he in fact did timely appeal and the delays were caused by

factors within the exclusive control of prison officials, not by

any intentional or unintentional delay on the part of Starr.

This fact was also disregarded by the reviewing officials.[4]

Discussion

I.   <u>Section 1983</u>

Section 1983 creates a cause of action against those who,

acting under color of State law, violate federal constitutional

or statutory law.  <u>See</u> 42 U.S.C. § 1983;[5] <u>City of Okla. City v.</u>

---

[4]Although generally applied in the context of determining
the timeliness of court filings by inmates rather than the
sending of internal administrative grievances, the "prison
mailbox rule" states that an inmate's pleading is to be
considered filed at the time it is properly placed into the
custody of prison officials, because after that time, the inmate
has no control over the handling of the document and is not able
to guarantee, through his own diligence, that the document will
be advanced to the proper recipient in a timely fashion.  <u>See</u>
<u>Houston v. Lack</u>, 487 U.S. 266, 271-72 (1988); <u>Casanova v. Dubois</u>,
304 F.3d 75, 78-79 (1st Cir. 2002).

[5]42 U.S.C. § 1983 provides that:

>     Every person who under color of any statute,
>     ordinance, regulation, custom, or usage, of any
>     State or Territory or the District of Columbia,
>     subjects, or causes to be subjected, any citizen of
>     the United States or other person within the
>     jurisdiction thereof to the deprivation of any
>     rights, privileges, or immunities secured by the
>     Constitution and laws, shall be liable to the party
>     injured in an action at law . . . .

Tuttle, 471 U.S. 808, 829 (1985); Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978); Soto v. Flores, 103 F.3d 1056, 1061–62 (1st Cir.), cert. denied, 522 U.S. 819 (1997).  Here, Starr has raised several claims that the DOC employee defendants, all state actors, have violated his federal constitutional rights.[6]  As such, his claims arise under § 1983.

II.  First Amendment

Incarceration brings about necessary limits on certain aspects of an inmate's constitutional rights.  Turner v. Safley, 482 U.S. 78, 84 (1987).  The First Amendment rights of prisoners may be abridged to the extent that the exercise of those rights is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 129 (1977) (internal citations omitted).  However, prison inmates

---

[6]All of Starr's claims arise under § 1983.  The claims identified in this Order will be considered for all purposes to be the claims raised in this action.  If Starr disagrees with this identification of the claims, he must do so by properly moving to amend his complaint.

maintain a First Amendment right, albeit not an unlimited right, to send and receive mail.  See id.; see also Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

The First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it." Martin v. City of Struthers, 319 U.S. 141, 143 (1943).  The First Amendment "protects material disseminated over the internet as well as by the means of communication devices used prior to the high-tech era."  Clement v. Cal. Dep't of Corrs., 364 F.3d 1148, 1152 (9th Cir. 2004) (citing Reno v. ACLU, 521 U.S. 844, 868 (1997)).  In the prison context, a number of courts have found that applying "publisher's only" rules to restrict all printed material sent into the prison with a personal letter, as opposed to directly from the publisher, violates inmates' First Amendment rights.  See e.g., Lindell v. O'Donnell, 211 Fed.Appx. 472, 474 (7th Cir. 2006), cert. denied, 127 S.Ct. 2104 (2007) (recognizing that an all-out ban on receiving printed internet materials from friends and family members would be unconstitutional); Lindell v. Frank, 377 F.3d 655, 660 (7th Cir. 2004), cert. denied, 543 U.S. 1169 (2005) (concluding that application of "publisher only" rule to all newspaper clippings and copies was a "close issue because of the deference prison administrators enjoy," but was

unconstitutional in that prisoners lacked access to the restricted materials and less exaggerated responses were available); Allen v. Coughlin, 64 F.3d 77, 80-81 (2d Cir. 1995) (recognizing that a constitutional violation may exist where prison officials remove "entirely innocuous" newspaper clippings from prisoners' mail pursuant to a publisher-only rule).

In Turner, the Supreme Court set out a four-factor test for courts to use in determining whether a particular prison policy serves legitimate penological objectives: (1) whether the regulation is rationally related to a legitimate and neutral government objective; (2) whether the inmate has other avenues available to exercise the right in question; (3) the impact that accommodating the asserted right will have on prison guards and other prisoners, as well as on the allocation of prison resources; and (4) whether there is any ready alternative to the regulation that will fully accommodate the prisoners' rights at de minimus cost to valid penological interests, indicating that the regulation is an exaggerated response by prison officials. 482 U.S. at 87, 89-90.  Applying this test, I will examine the regulations at issue here to determine whether or not Starr can state an actionable deprivation of his First Amendment rights.

A.   The Mail Regulation

The handling of prisoner mail is governed by PPD 5.26 which provides procedures for the review of all incoming mail to inmates.[7]  Purportedly following that policy, defendant Coulombe seized Starr's incoming mail because it contained several sheets of loose paper with New Hampshire statutes on them that had been printed from the internet.  The material was forwarded to the LRC and reviewed by defendants Coulombe, Greenwood, Clough, Redmond, and Walsh.  Upon review, the LRC did not make any determination that the content of the mailing was contraband, but determined that because it was a "large quantity"[8] of papers printed from the internet, the mailing violated the "Publisher's Only" rule.

The "Publisher's Only" rule, located at PPD 5.26(IV)(D)(1), requires that "[a]ll publications, tapes, records, discs or other material may be introduced into the mail by a bona fide publisher

---

[7]PPD 5.26 and the "Rejected Material" form attached to PPD 5.26 are reproduced and addended to this Order, for reference, as Attachment 1.

[8]None of the notices to Starr regarding the mailing advised him of how many pages the envelope contained, or what number of pages would constitute a "large quantity."  PPD 5.26 does not identify any number of loose pages in its definition of materials that need to be received directly from a publisher.  Starr does state that the information all fit into a single envelope, along with a personal letter.

or bona fide bookstore and prepaid by direct subscription only."
The rule creates an exception for "[o]ne (1) subject article from
a publication" included in a piece of mail, provided that the
article is on paper no larger than 8 ½" x 11" and is not altered.
PPD 5.26(IV)(D)(2).

A separate section of the regulation governing the receipt
of mail by a prisoner defines materials that must be sent
directly by a publisher as "[b]ooks, magazines, periodicals,
newspapers and recordings [tapes, discs or records]."  Nothing in
PPD 5.26 specifically addresses the mailing of loose pages
downloaded from the internet sent in an envelope, or addresses
material printed from the internet at all.  The only reference to
"large quantities" of paper sent to an inmate in PPD 5.26
indicates that "[w]hen the cost is borne by the inmate, there is
no limit on the volume of letters an inmate may send or receive,
or on the length, language, content or source of mail or
publications, except when there is a reasonable belief that the
limitation is necessary to protect public safety or institutional
order and security."  PPD 5.26(IV)(E)(1).  There is no indication
in the facts alleged by Starr that there was any danger to public
safety, institutional order, or institutional security presented

by several loose sheets of paper that were printed with New
Hampshire laws.

Several other provisions of PPD 5.26 are relevant to Starr's
complaint.  PPD 5.26(IV)(C)(1) mandates that the LRC be made up
of three members, including representatives of the DOC's
security, mental health, and educational staff.  PPD 5.26 governs
the treatment of mail that the LRC determines to be unacceptable
for prisoner receipt.  PPD 5.26(IV)(N)(1) permits an inmate ten
days, from the date of decision, to appeal to the Warden an LRC
rejection of a piece of incoming mail.  That provision also gives
the inmate an additional ten days, should the Warden deny the
inmate's appeal, to send the rejected material out of the
institution.  Only after that ten day grace period can the mail
be either discarded, destroyed, or returned to the sender of the
mail at the inmate's expense.

PPD 5.26(IV)(C)(8) also directs the LRC to advise inmates
that their incoming mail has been rejected by using a "Rejected
Material" form that is attached to PPD 5.26.  That form advises
the inmate that he or she has ten days from the date on the form
to appeal the rejection of the mail to the Warden, and that such
an appeal should be taken by sending an inmate request slip.  The
form further warns inmates that if no timely appeal is filed, the

material will be held in the mail room for an additional ten days and then the material will be returned to the sender at the inmate's expense.

PPD(IV)(B)(4) prohibits the rejection of mail because its content is "religious, philosophical, political, social, sexual, unpopular or repugnant."  Essentially, prison officials may not reject mail based on its content unless that content poses a threat to the safety and security of the institution, its employees, or any of the inmates.

Finally, PPD (IV)(B)(5) and PPD (IV)(C)(5) direct prison officials to destroy the entire contents of an incoming package or envelope if any portion of the package or envelope is objectionable or offensive, including publications, personal mail or printed material.  This regulation is reasonable, according to its own terms, "[b]ecause tearing out rejected or offensive portions of personal mail, publications or printed materials creates animosity and ill will."  Plainly stated, the prison has deemed it better to destroy the entire mailing rather than just the portion of the mailing that the LRC has decided to reject.

B.   Burden of First Amendment Rights and Legitimate
     Penological Objectives

Starr's right to receive mail and publications has
unquestionably been burdened by the defendants' use of PPD 5.26
to seize, prohibit, and destroy a personal letter and pages of
statutory law that had been mailed to him at NCF.  Because the
application of the regulation impinged Starr's First Amendment
right to receive mail, the regulation must be reasonably related
to a legitimate penological objective.  There is no doubt that
monitoring, and some regulation of, information that flows into
the prison is a legitimate penological objective, to the extent
that such monitoring and regulation serves to protect
institutional security, or to prevent the introduction of
contraband, or illegal, disruptive, or dangerous information
into the prison.  Thornburgh, 490 U.S. at 415 (citing Pell v.
Procunier, 417 U.S. 817, 823 (1974)).

This is not to say, however, that the standard is without
power to control a prison regulation's overbreadth.  The
reasonableness standard set forth in Turner, to be utilized by
the Court in evaluating the relationship of the regulation to a
legitimate penological objective, provides:

> if . . . satisfied by nothing more than a '*logical*
> connection' between the regulation and any legitimate

> penological concern perceived by a cautious warden, it
> is virtually meaningless.  Application of the standard
> would seem to permit disregard for inmates'
> constitutional rights whenever the imagination fo the
> warden produces a plausible security concern and a
> deferential trial court is able to discern a logical
> connection between that concern and the challenged
> regulation.

Turner, 482 U.S. at 100-01 (Stevens, J.) (concurring in part and

dissenting in part) (citation omitted) (emphasis in original).

Accordingly, Turner must be read to require some objectively

reasonable connection be able to be drawn between a prison rule

and the legitimate concern to which the rule is addressed.  A

connection, examined under a less stringent standard requiring

only a logical link between the rule and its motivation, risks

creating carte blanche to any prison administration that can draw

a line, however tenuous, between a rule limiting inmates' rights

and some broad or catch-all security concern, as long as the line

drawn is not illogical.

     C.   Reasonableness Under the Four Turner Factors

     Starr's complaint spells out a restriction of his First

Amendment rights, occasioned by the application of a regulation

that appears to be related to a legitimate penological concern.

Whether or not that restriction is an unreasonable burden on

Starr's First Amendment rights is determined by the four-factor

analysis set out in <u>Turner</u>.  As described below, after evaluating
these factors, I find that Starr has sufficiently alleged that
his First Amendment rights were unreasonably restricted by the
application of PPD 5.26 to allow this claim to proceed against
the defendants here.

       1.   <u>Rational Relationship and Neutral Objective</u>

    A prison regulation impinging on Starr's First Amendment
right to receive mail must bear a rational relationship to a
neutral penological objective.  <u>Thornburgh</u>, 490 U.S. at 415;
<u>Turner</u>, 482 U.S. at 90.  As discussed above, a regulation that
allows the prison to censor mail and to determine, based on
content, whether or not a particular piece of mail presents a
risk to institutional security, has a rational relationship to a
legitimate penological interest.  According to Starr's complaint,
however, PPD 5.26 was applied to him in order to suppress his
criticism of the prison, as expressed by his litigation against
the prison.  Starr points to the fact that New Hampshire statutes
printed from the internet were censored, seized, and destroyed by
prison officials, while other materials, including health-related
and spiritual or religious information, mailed in substantially
the same format of loose pages downloaded from the internet, were
permitted.  I find, therefore, that Starr has alleged that the

regulation in question was rendered illegitimate by the improper purpose of suppressing Starr's permissible First Amendment right to express his opinion of the prison and his prison conditions and to seek redress for his grievances.  See Thornburgh, 490 U.S. at 415-16 (finding under Turner that only those regulations based solely on the regulated activities' potential for disrupting prison security, are neutral) (emphasis added).

> 2.  Alternative Means of Exercising Right

To permissibly curtail Starr's First Amendment right, a regulation must not be so broad as to prevent Starr from exercising the right in question by any other means.  Thornburgh, 490 U.S. at 418; Turner, 482 U.S. at 90.  Ordinarily, inmates can retrieve New Hampshire statutory law from the prison library.  In this case, however, Starr alleges that a lockout preventing Starr from accessing the statutes in question at the prison's library computer prevented him from obtaining the information he needed, and that waiting to obtain the information in another way would have interfered with his then-pending litigation.  Accordingly, I find that Starr has alleged that in this instance he did not have an adequate alternative means of exercising his right to obtain legal materials.

3.   <u>Impact of Accommodation of Starr's Rights</u>

The Court must consider the impact that accommodating Starr's asserted rights would have on guards and inmates at the prison.  <u>Thornburgh</u>, 490 U.S. at 418; <u>Turner</u>, 482 U.S. at 90. Assuming, as I must, that the facts alleged by Starr are true, it does not appear that there would have been any adverse impact at all to the prison, prison employees, or any other inmate, in allowing Starr to receive his personal letter and the statutes enclosed with it.  There is no apparent safety or security risk based on the physical nature of loose sheets of paper containing New Hampshire statutory law.  Further, it would not have cost any time or money to forward Starr's incoming mail to him promptly upon ascertaining its content, which could have been accomplished by a fairly cursory review of the documents.

4.   <u>Ready Alternative/Exaggerated Response</u>

"[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." <u>Turner</u>, 482 U.S. at 90.  The regulation that was used to justify the seizure and destruction of Starr's mail in this case is not actually contained within the text of the PPD governing the treatment of incoming mail.  It appears that, in response to the likely

relatively new phenomenon of material being downloaded from the internet and then forwarded to inmates in letters, the prison administration has attempted to craft a response by determining that undefined "large quantities" of paper would be rejected as violating the "Publisher's Only" rule.  Without a review of the content of the material, however, rejecting papers that fit within an envelope as "large quantities" of paper, when there is no volume restriction on mail, appears to be an exaggerated response to the issue of internet materials being sent into the prison.  While such a regulation might be drafted to prevent inmates from skirting a "Publisher's Only" rule and secreting in contraband information within hundreds of pages of paper, it is a stretch to apply such a rationale to paper that fits inside an envelope.  Such a document cannot create more of a security risk than a word-processed personal letter that fits inside an envelope of the same length, and which PPD 5.26 explicitly permits.  Accordingly, I find that, at least as applied in this matter, the regulation, as alleged, is an exaggerated response on the part of prison officials to a potential penological concern. The regulation, as applied, therefore, unreasonably restricts Starr's First Amendment rights.

III. <u>Due Process Claims</u>

Plaintiff's second claim asserts the deprivation of a liberty interest created by the First Amendment to the United States Constitution.  <u>Thornburgh</u>, 490 U.S. at 418.[9]  The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV.  Starr is entitled to due process procedures that ensure that his right to receive mail is protected from arbitrary government action.  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 557 (1974).  Starr is entitled to "minimum procedures appropriate under the circumstances and required by the Due Process Clause" that insure that his First Amendment rights are protected.  <u>Id.</u>  Starr describes a hearings process in which the LRC failed to include a member of the DOC educational

_____

[9]It appears that plaintiff is further asserting the deprivation of a liberty interest created by the NHSP regulations governing mail.  State-created regulations may create a protected liberty interest that affords a prisoner due process when facing a deprivation of that interest.  <u>Dominique v. Weld</u>, 73 F.3d 1156, 1159 (1st Cir. 1996) (citing <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995)).  Because a prisoner's right to receive mail is protected by the federal constitution, I do not find it necessary at this stage of litigation to assess whether those regulations have created any due process rights independent of the process due to Starr to enable him to protect his substantive constitutional rights.

staff, Starr was denied notice by way of specific rule or
regulation that the incoming mail was problematic, and was denied
adequate clear notice that his mail would be destroyed.  Starr
further alleges that the process afforded him effectively denied
him the opportunity to appeal the LRC decision prior to the
destruction of his mail.  Starr therefore has sufficiently
alleged a denial of due process to state a claim upon which
relief may be granted regarding the formation of the LRC, the
procedures employed by the LRC, and the appeal taken after the
LRC ruling.  Accordingly, I direct that the due process claims be
served on the defendants.

IV.  Retaliation

    Starr next alleges that the seizure and destruction of his
mail, and the denial of due process that followed, constituted
unconstitutional retaliation for the exercise of his First
Amendment rights.  Conduct on the part of prison officials that
is "not otherwise constitutionally deficient is actionable under
§ 1983 if done in retaliation for the exercise of
constitutionally protected first amendment freedoms."  Oropallo
v. Parrish, No. 93–1953, 1994 WL 168519, at *3 (D.N.H. May 5,
1994), aff'd, 23 F.3d 394 (1st Cir. 1994) (citing Ferranti v.
Moran, 618 F.2d 888, 892 n.4 (1st Cir. 1980) ("[A]ctions

otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms.") (citation omitted)); see Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993), cert. denied, 512 U.S. 1209 (1994) (prison officials cannot lawfully impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right).  "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  On the other hand, as noted above, prison officials may make policy that is reasonably related to legitimate penological interests, even at the expense of certain constitutional rights.  See Beard v. Banks, ___ U.S. ___, 126 S.Ct. 2572, 2579 (2006) (citing Turner, 482 U.S. at 89–90).

In order to state a claim for retaliation for exercising his First Amendment rights, Starr must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment, (2) some adverse action at the hands of the prison officials, and (3) a causal link between the exercise of his First Amendment rights and the adverse action take.  See Price v.

25

<u>Wall</u>, 464 F. Supp. 2d 90, 96 (D.R.I. 2006); <u>see</u> <u>also</u> <u>LaFauci v.</u>
<u>N.H. Dep't of Corr.</u>, No. Civ. 99-597-PB, 2005 WL 419691, at *7
(D.N.H. Feb. 23, 2005) (Unpublished Order).  I consider each of
these elements of a retaliation claim in turn.

> A.   <u>Petitioning the Government for Redress of</u>
>      <u>Grievances/Maintaining Right of Access to the</u>
>      <u>Courts</u>

The right to petition the government for a redress of
grievances has been characterized as "among the most precious of
the liberties safeguarded by the Bill of Rights."  <u>United Mine</u>
<u>Workers v. Ill. State Bar Ass'n</u>, 389 U.S. 217, 222 (1967).  In
the prison context, this right means that inmates must be
"permit[ted] free and uninhibited access . . . to both
administrative and judicial forums for the purpose of seeking
redress of grievances against state officers."  <u>Turner</u>, 482 U.S.
at 84 (citing <u>Johnson v. Avery</u>, 393 U.S. 483 (1969)); <u>Sostre v.</u>
<u>McGinnis</u>, 442 F.2d 178, 200 (2d Cir. 1971) (en banc), <u>cert.</u>
<u>denied</u>, <u>Sostre v. Oswald</u>, 404 U.S. 1049 and <u>Oswald v. Sostre</u>, 405
U.S. 978 (1972).

Starr has alleged that he exercised his First Amendment
right to petition the government for a redress of grievances by
engaging in litigation against the prison and its employees both

prior to and during the time the acts challenged here occurred.[10] Starr alleges that the fact that his litigation history was known to the defendants, some of whom were previously named as defendants to other suits he filed, and that he was receiving mail that was obviously related to either pending or future litigation, gives rise to the inference that the seizure and premature destruction of his mail, as well as the denial of his due process rights, were done in retaliation for his constitutionally protected conduct of petitioning the government for a redress of his grievances against the DOC.  Because Starr's prior and future litigation is protected by the First Amendment as an exercise of his right to petition the government to redress grievances, Starr has alleged sufficient facts to satisfy the first requirement for stating a retaliation claim.

---

[10]Starr has filed a number of lawsuits against DOC employees in this Court.  See Starr v. Corr. Comm'r, No. 89-cv-MFL (filed July 25, 1989); Lepine v. Corr. Comm'r, No. 97-cv-072-SM (filed Feb. 18, 1997); Cookish v. Rouleau, No. 02-cv-028-SM (filed Jan. 18, 2002); Starr v. Rouleau, No. 02-cv-053-SM (filed Jan. 29, 2002); Starr v. N. N.H. Corr. Facility, Warden, No. 04-cv-002-SM (filed Jan. 5, 2004); Starr v. Dube, No. 05-cv-264-SM (filed July 26, 2005) (raising issues occurring simultaneously with the events at issue here); Starr v. Cox, No. 05-cv-368-JD (filed Oct. 27, 2005) (same).

B.   Adverse Action

To state an adverse action, plaintiff must allege that the defendants subjected him to "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her Constitutional rights."  Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled in part on other grounds by Phelps v. Kapnolas, 308 F.3d 180, 187 n.6 (2d Cir. 2002); see Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999).  Even if a particular inmate is not chilled in his expression, a claim for retaliation may still arise if the retaliatory behavior alleged is objectively sufficient and onerous to deter an ordinary person from exercising his rights.  Gay v. Shannon, No. Civ.A. 02-4693, 2005 WL 756731, *8 (E.D.Pa. 2005) (citing Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000)).  Starr alleges that the defendants seized his mail containing both legal materials and a personal letter, determined that the legal materials violated prison regulations, and that they then destroyed the entire correspondence before the expiration of the period for appeals allowed by the mail regulations.  The premature destruction of the mail, Starr alleges, was also caused by the improper application of a "five day notice" to a mail situation, the failure of the prison to provide him with time in the library to

28

prepare his appeal before the expiration of the improperly abbreviated appeals period, and then the failure to deliver the appeal to the Warden for five additional days. I find that an inmate of ordinary firmness might well be chilled in his efforts to litigate his grievances against the prison, both administratively and in the courts, if his efforts to do so were expected to be rewarded with the destruction of his personal mail without being afforded the proper opportunity to challenge such an action. Starr, therefore, has stated sufficient facts to allege that adverse actions were taken against him that would chill an ordinary inmate in his situation from exercising his First Amendment right to petition the government for a redress of grievances.

     C.   <u>Retaliatory Action Caused by First Amendment Violation</u>

     Circumstantial evidence is often enough to support a claim that an adverse action was taken with retaliatory intent, as intentions are often difficult to prove through direct evidence. <u>See</u> <u>Beauchamp v. Murphy</u>, 37 F.3d 700, 711 (1st Cir. 1994), <u>cert. denied</u>, 514 U.S. 1019 (1995); <u>Ferranti</u>, 618 F.2d at 892 (chronology of events provided support for inference of retaliation); <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979) (same); <u>see also</u> <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir.

1995), <u>cert. denied</u>, <u>Palermo v. Woods</u>, 516 U.S. 1084 (1996).
Here, Starr alleges that mail he received containing materials
printed off the internet that were nonlegal in nature were
forwarded to him without question.[11]  When he was sent a letter
containing loose sheets of paper with New Hampshire statutes
printed on them, however, his mail was seized, and was subject to
an extra-regulation timetable for appeal, and therefore destroyed
before Starr had any opportunity to appeal the rejection of his
mail to the appropriate authorities.  When he attempted to grieve
this allegedly inappropriate destruction of his personal letter
and legal materials, he was advised at each level of his appeal
that the destruction of his mail was the result of his own
inaction, and not the result of a misreading of the regulation.
The responses to Starr's thoroughly argued position containing
references to the regulations governing mail uniformly failed to
acknowledge Starr's arguments and references to the prison's own
regulations.  Both Warden Cattell's and Attorney Vinson's

---

[11]The nonlegal documents printed from the internet and
mailed in letters, in the same form as the mail at issue in the
instant complaint, which were not seized, are attached to Starr's
complaint.  These documents were on the subject of Tai Chi Chuan
practice (eleven pages mailed in and accepted by the NCF
mailroom) and a medical condition called folliculitis (2 pages
mailed in and accepted by the NCF mailroom).

responses to Starr adopted a tone which clearly indicated that
Starr's arguments citing to the law and to the prison's
regulations were beyond reason or understanding.  These events,
considered together, present sufficient circumstantial evidence
of an intent to retaliate against Starr for the exercise of his
First Amendment rights to meet the third requirement for a
retaliation claim.  Accordingly, I find that Starr has stated a
retaliation claim upon which relief may be granted, and I direct
that this action be served on the defendants named in the
complaint.

V.   <u>Supervisory Liability Claims</u>

Starr has named Thyng, Cattell and Vinson as defendants to
this action in their supervisory capacities.  Starr bases his
allegation of supervisory liability on the fact that, through
Starr's grievances and appeals, the supervisory defendants were
aware of the violation of Starr's constitutional rights, and yet
they failed to remedy the situation.  "Supervisory liability
under § 1983 cannot be predicated on a respondeat [superior]
theory, but only on the basis of the supervisor's own acts or
omissions."  <u>Aponte Matos v. Toledo Davila</u>, 135 F.3d 182, 192
(1st Cir. 1998) (internal citations omitted).  A supervisor, to
be liable for the acts of those who serve underneath him, "either

was a primary actor involved in, or a prime mover behind, the underlying violation." Camilo-Robles v. Zapata, 175 F.3d 41, 43–44 (1st Cir. 1999).  There must be "an affirmative link, whether through direct participation or through conduct that amounts to condonation or tacit authorization" to the violation alleged. Id. at 44.

Construing the allegations in the complaint as true, as I am required to do at this preliminary stage of review, the facts readily demonstrate that the supervisory defendants implicitly approved and supported the deprivation of Starr's First Amendment rights by failing to respond to Starr's complaint in any meaningful way.  By advancing policies that served to deprive Starr of his rights, they were directly responsible for the losses sustained by Starr.  Starr has, therefore, sufficiently alleged that Thyng, Cattell, and Vinson were responsible for the first amendment violation and retaliation alleged, in their individual as well as supervisory capacities, and I direct that the claims in this case be served against those defendants in their individual supervisory capacities.

Conclusion

As I find that plaintiff has stated claims upon which relief may be granted, I order the complaint (document no. 1) be served

32

on Defendants.  The Clerk's office is directed to serve the New Hampshire Office of the Attorney General ("AG's office"), as provided in the Agreement On Acceptance Of Service, copies of this order and the complaint (document no. 1).  See LR 4.3(d)(2)(C).  Within thirty days from receipt of these materials, the AG's office will submit to the court an Acceptance of Service notice specifying those defendants who have authorized the AG's office to receive service on their behalf.  When the Acceptance of Service is filed, service will be deemed made on the last day of the thirty-day period which runs from the AG's receipt of these materials.

As to those defendants who do not authorize the AG's office to receive service on their behalf or whom the AG's office declines to represent, the AG's office shall, within thirty days from receipt of the aforementioned materials, provide a separate list of the last known addresses of such defendants.  The Clerk's office is instructed to complete service on these individuals by sending to them, by certified mail, return receipt requested, copies of these same documents.

Defendants are instructed to answer or otherwise plead within twenty days of acceptance of service.  See Fed. R. Civ. P. 12(a)(1)(A).

33

Plaintiff is instructed that all future pleadings, written motions, notices, or similar papers shall be served directly on the Defendants by delivering or mailing the materials to them or their attorneys, pursuant to Fed. R. Civ. P. 5(b).

**SO ORDERED.**

/s/ Justo Arenas
Justo Arenas
United States Magistrate Judge
Sitting by Designation

Date:     July 3, 2007

cc:       Darren T. Starr, pro se