UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Darren Starr</u>,
 Plaintiff

 v.           Civil No. 06-cv-487-SM
             Opinion No. 2009 DNH 004
<u>Timothy Coulombe, et al.</u>,
 Defendants

# O R D E R

Plaintiff, Darren Starr, is an inmate at the Northern New Hampshire Correction Facility ("NCF") and, although acting pro se, he is an experienced litigant in this court.[1]

---

[1] In 1987, Starr was convicted in state court of second-degree murder and sentenced to a term of twenty-eight years to life imprisonment. Since then, he has been one of this court's more frequent litigants, filing numerous civil actions challenging a wide array of the conditions of his confinement. Among other things, Starr has claimed that prison officials wrongfully deprived him of a marriage licence by refusing to drive him to the local town clerk's office, thereby preventing him from marrying his girlfriend (Civ. no. 04-cv-02); that prison officials violated his constitutional rights when personal property was damaged during a search of his cell (Civ. no. 05-cv-264); that a prison mail regulation prohibiting inmates from receiving publications containing photographs of nude female models depicted in lesbian love scenes violates his First Amendment rights (Civ. no. 97-cv-72); and, although he is not a Taoist, that his statutory and constitutional rights were violated when prison officials restricted the practice of certain aspects of Tai Chi – a form of martial arts (Civ. no. 05-cv-368).

To be fair, none of Starr's complaints has been dismissed as patently frivolous, and each is thoroughly researched, articulately stated, and well plead. Yet, to date, it does not appear that Starr has prevailed on any of his federal claims. Nevertheless, he remains undaunted.

In his latest suit, Starr again seeks compensatory and punitive damages, as well as declaratory and injunctive relief, for alleged violations of his constitutionally protected rights. Specifically, Starr claims that various employees of the New Hampshire Department of Corrections violated his First and Fourteenth Amendment rights when they intercepted, and subsequently destroyed, several pages of printed statutory materials that had been mailed to him by one of his friends. And, he goes on to say that defendants then deprived him of certain procedural protections when he lodged various grievances concerning the decision not to deliver those materials to him in the prison.

Defendants move for summary judgment as to all three claims advanced in Starr's complaint. Starr objects and, in turn, moves for summary judgment as to his due process and retaliation claims.

### Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs–Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate

2

when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." <u>Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted).  The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with <u>evidence</u> that conflicts with that proffered by the moving party.  <u>See generally</u> Fed. R. Civ. P. 56(e).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation.  <u>See Serapion v. Martinez</u>, 119 F.3d 982, 987 (1st Cir. 1997).

**Background**

Based upon the record before the court, the undisputed
material facts appear to be as follows.  On November 18, 2003,
and again at some point in December of 2003, Starr had difficulty
accessing certain New Hampshire statutes and administrative
regulations using the prison's computers.  Specifically, Starr
sought "complete copies . . . of RSA 21-H, RSA 622, and the
Nursing Board Rules."  Complaint, Exhibit 6-d, at para. 4.
Frustrated by his inability to obtain those documents using the
resources available to him at the prison, Starr contacted a non-
prisoner friend and asked that she use her own computer to access
the materials in question, print out copies, and mail them to
Starr.  She complied and the materials arrived at the prison, in
a single envelope, on or around December 23, 2003 (the "printed
materials").

Pursuant to prison regulations, the materials were held
until a meeting of the Literary Review Committee (the "LRC")
could convene and determine whether or not the printed materials
could be forwarded to Starr.  That committee met on February 19,
2004, and rejected the materials as being too voluminous and in
violation of the prison's "Publisher's Only Rule."  That same
day, Starr was informed of the committee's decision and told,
"You have ten (10) days from the above date to appeal to the

Warden.  If you do not appeal, the above publication will be
returned to the sender at your expense."  Complaint, Exhibit 3,
Notice of Rejected Material.  See generally N.H. Dept. of
Corrections Policy and Procedure Directive ("PPD") 5.26 IV D (the
"Publisher's Only Rule," which provides that commercially
published materials may be sent to inmates only by the publisher
and states that "items that have been re-packed or delivered by
other sources will not be accepted) and PPD 5.26 N (providing
inmates with ten days within which to appeal adverse decisions
issued by the committee).

    Attached to that notification was a "5 Day Notice" from the
prison's mail room.  That document notified Starr that, because
the printed materials had been rejected by the LRC, he had
"excess/unauthorized mail/property that needs to be removed from
the N.H. State Prison."  Complaint, Exhibit 4.  See generally PPD
9.2 IV (governing inmate property and providing that
"unauthorized property must be removed within five (5) business
days of intake/reception, otherwise it will be disposed of by the
State").  In accordance with PPD 9.2, Starr was notified that he
had five business days from the date of the notice within which
to either remove the materials or file an appeal.  Starr was also
informed that if he failed to do so, the property would be
destroyed.  Plainly, the notices given to Starr – one of which

gave him ten days to appeal the rejection of his mail, and the other which afforded him only five business days to appeal the proposed destruction of that material – were confusing.  (The printed materials probably did not qualify as "excess/unauthorized property" subject to destruction until the appeal period expired without Starr having filed an appeal or, if one was filed, until it was finally resolved.)

    As to the printed materials themselves, the parties dispute the actual number of pages sent to Starr.  Those materials have been destroyed and there is apparently no record of precisely how many pages were included in the mailing.  Starr says that, after the events in question, he was able to use the prison's computers to successfully print out "the specific sections" of the statute and regulations he sought "and they total only 38 pages." Plaintiff's memorandum (document no. 20-2) at 2.  Defendants, on the other hand, represent that they have printed out those materials and say they comprise 132 pages.  The discrepancy, say defendants, is because Starr printed only excerpts of the statutory or regulatory materials, rather than the "complete printouts of RSA 21-H, RSA 622, and the Nursing Board Rules," Complaint, Exhibit 6-d, at para. 4., as he had originally requested.  Defendants' reply memorandum (document no. 24) at 2. Construing the record in the light most favorable to Starr, the

court will assume that the mailing directed to Starr was comprised of thirty-eight pages of Internet printouts.

Starr says (and defendants do not dispute) that, on February 26, 2004, he deposited into the E-Pod request slip box an inmate request slip ("IRS") appealing the rejection of the printed materials.  The IRS was not received by prison authorities until March 1, 2004, by which time Starr's materials had already been destroyed.  On March 10, 2004, Warden Bruce Cattell responded to Starr's IRS, informing him that the materials had been destroyed, and stating (probably in error) that Starr had failed to file a timely appeal.[2]

---

[2]   Neither Starr nor the State has pointed the court to a controlling definition of the phrase "business days," as used in the PPDs.  Accordingly, the court assumes that phrase has its customary meaning – that is, days other than weekends and federal holidays — and that traditional counting rules apply as well. Under that definition of the phrase, and assuming Starr actually deposited his initial IRS in the appropriate box on February 26, 2004, it was filed in a timely manner.  That is to say, it was filed within five business days of the notice informing him that his mail had been rejected and would be destroyed as excess/ unauthorized property if he did not make arrangements for its removal.

But, as defendants point out, Starr's initial IRS challenged the <u>rejection</u> of his mail.  It did not specifically challenge (or even mention) the prison's plan to <u>destroy</u> that material if Starr did not appeal.  <u>See</u> Complaint, Exhibit 5. Consequently, defendants say they were entirely correct to rule that Starr did not timely appeal the decision to destroy the materials.  And, it follows that defendants believe the subsequent destruction of that material was completely appropriate.  Again, however, the material was probably not "excess" until the rejection was final, which it was not.  To

Two weeks later, on March 24, Starr filed a separate IRS, complaining about the destruction of the materials. Unit Manager Robert Thyng responded, again, arguably in error, that Starr had failed to file a timely appeal of the decision to reject his printed materials as violative of the Publisher's Only Rule and to destroy them as unauthorized materials. Starr filed a second-level grievance to the warden, who also responded that the materials were destroyed because Starr failed to file an appeal within the required five-day period. Starr's third-level appeal to the Commissioner was denied on the same grounds. This litigation ensued.

## Discussion

In his complaint, Starr advances three claims: first, that defendants violated his First Amendment rights by refusing to allow him to receive copies of N.H. Rev. Stat. Ann. ("RSA") ch. 622 and ch. 21-H, which a friend printed off the Internet and mailed to him (count one); next, that defendants violated his Fourteenth Amendment right to due process by failing to provide the review required by Department of Corrections policy prior to rejecting his mail (count two); and, finally, that defendant Coulombe violated his Fourteenth Amendment right to due process

---

avoid future problems, the prison ought to consider clarifying the apparent inconsistencies in its policies.

by "inhibiting his appeal of the rejection of his mail,"
Complaint at para. 14 (count three).  The magistrate judge
charitably construed Starr's third count as asserting a claim
that "the seizure and destruction of his mail, and the denial of
due process that followed, constituted unconstitutional
retaliation for the exercise of his First Amendment rights."
Order (document no. 4) at 24.  Starr has embraced that generous
construction of his complaint and, although he has not sought to
amend his complaint to specifically state a retaliation claim, he
has implicitly attempted to do so.  <u>See</u> Plaintiff's memorandum
(document no. 20-2) at 14.  Because the magistrate judge
construed the complaint to allege a retaliation claim, the court
will treat the complaint as though it actually advances such a
claim.[3]

---

[3]     As the court reads Starr's complaint, it is difficult
to see how count three actually alleges a retaliation claim.
While Starr complains about defendant Coulombe's decision to
issue the five-day notice (regarding proposed destruction of the
materials at issue), he does not allege that Coulombe was acting
in retaliation for any conduct in which Starr had engaged.   In
fact, Starr repeatedly says it was Coulombe's routine practice to
issue the five-day notice whenever any inmate's mail was
rejected.  <u>See, e.g.,</u> Complaint at para. 44 ("The Plaintiff
asserts that Coulombe's unauthorized issuance of the 5-day notice
was not an isolated incident, but was rather routine action when
any mail was rejected by the LRC.").

I.   <u>Count One — First Amendment</u>.

As noted above, the prison refused to deliver the statutory and regulatory materials that were printed off the Internet and mailed to Starr because the Literary Review Committee concluded that those materials were too voluminous and violated the Publisher's Only Rule.  <u>See</u> PPD 5.26.  And, soon after those materials were rejected, they were destroyed as excess, unauthorized property.  <u>See</u> PPD 9.2.  Starr claims those actions violated his First Amendment rights.  The court disagrees.

When a correctional facility's regulations interfere with an inmate's constitutionally protected rights, such regulations are valid only if they are "reasonably related to legitimate penological interests."  <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  To assist lower courts in determining whether a challenged regulation passes constitutional scrutiny, the Supreme Court identified four factors that should be considered:

> 1.   whether there is a logical, valid connection between the regulation and the penological goal(s) sought to be advanced by that regulation — a connection that is not so remote as to render the policy arbitrary or irrational;
>
> 2.   whether there are alternate means by which the inmate might exercise the asserted constitutional right — means that remain open to him despite his incarceration;

3.   whether the accommodation requested by the inmate so that he might exercise the asserted constitutional right would have an adverse effect on guards, other inmates, and/or the allocation of prison resources; and, finally,

4.   whether there are any obvious, easy alternate means by which the prison might accommodate the inmate's exercise of the asserted right.

See Id. at 89–92.  See also Shaw v. Murphy, 532 U.S. 223, 229–30 (2001).  Importantly, however, the Supreme Court urged lower courts to exercise restraint and give appropriate deference to the expert judgments of prison administrators.

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

Turner, 482 U.S. at 84–85.  See also Beard v. Banks, 548 U.S. 521, 536–37 (2006) (Thomas, J., concurring) ("Judicial scrutiny of prison regulations is an endeavor fraught with peril.  Just last Term, this Court invalidated California's policy of racially segregating prisoners in its reception centers, notwithstanding that State's warning that its policy was necessary to prevent prison violence.  California subsequently experienced several instances of severe race-based prison violence, including a riot

11

that resulted in 2 fatalities and more than 100 injuries, and
significant fighting along racial lines between newly arrived
inmates, the very inmates that were subject to the policy
invalidated by the Court.") (citation omitted).

Applying the four <u>Turner</u> factors to the instant case, the
court concludes that Starr's First Amendment rights were not
unlawfully infringed.[4]  First, the prison's Publisher's Only Rule
seeks to advance obvious legitimate penological goals, and there
is a logical, valid connection between the regulation and those
goals – a connection that is neither arbitrary nor irrational.
Defendants point out that Starr's materials were rejected, not
because of their content, but because of the large volume of
written material on the many pages of paper that were included in
the single mailing.  And, say defendants, the "penological
interest in regulating the volume of Internet printouts is, in
this case, the prevention of harmful information that might be
contained within the pages.  No cursory review of the printouts
could have detected such a danger."  Defendants' memorandum
(document no. 14-2) at 8.  Defendants go on to point out that:

> Typewritten material is not rejected outright.  The
> concern with Internet printouts is that large volumes

---

[4]     Starr does not challenges the Publisher's Only Rule on
its face.  Instead, he claims that it was applied to him in an
unconstitutional manner.  <u>See</u> Complaint at para. 32.

of material can be easily printed and sent to inmates.
Prison officials need to do a thorough search of every
page to be sure there is nothing contained in or on the
pages that might pose a security risk (i.e., an escape
plan buried in one of the pages). . . . [T]he same
concern does not exist for typed letters because the
risk of a large number of inmates being constantly sent
voluminous typed letters does not exist.

Id.[5]


The penological concerns identified by defendants are

plainly legitimate, as is the State's interest in limiting the

amount of staff resources that must be devoted to reviewing

incoming inmate mail.  See, e.g., Jackson v. Frank, 509 F.3d 389,

391 (7th Cir. 2007) (With regard to the first [Turner] factor, we

conclude that the defendants' economic interest in saving staff

resources [with respect to reviewing incoming inmate mail] is

legitimate.").  See generally Bell v. Wolfish, 441 U.S. 520, 550–

51 (1979) (concluding that a prison's publisher's only rule did

not violate inmates' First Amendment rights); Jones v. N.C.

Prisoners' Labor Union, Inc., 433 U.S. 119, 133 n.9 (1977) ("The

informed discretion of prison officials that there is potential

---

[5]     Although the prison regulations in effect when Starr's
materials were rejected did not specifically address voluminous
Internet printouts, those regulations currently allow inmates to
receive up to ten pages of such materials.  Presumably, that is
because the effort necessary to read and review up to ten pages
of material printed from the Internet does not impose an undue
burden on prison officials.  See Defendants' memorandum, Exhibit
H, PPD 5.26.

danger may be sufficient for limiting rights even though this
showing might be unimpressive if submitted as justification for
governmental restriction of personal communication among members
of the general public.") (citation and internal punctuation
omitted).

Turning to the next <u>Turner</u> factor, the record reveals that
there are alternate means by which inmates like Starr can acquire
the very materials at issue in this case.  The prison provides
inmates with access to computers capable of retrieving and
printing New Hampshire statutes and administrative regulations.
In fact, Starr concedes that he was able to get precisely the
materials at issue in this case by using the prison's computers.
Of course, Starr complains that because those computers were
"locked-out" when he attempted to acquire the statutes and
regulations, he was unable to acquire them without experiencing
some delay.  There is, however, no evidence that the "lockouts"
of which Starr complains were purposefully created by any one or
more of the defendants.  Nor is there any evidence suggesting
that the delay in acquiring the printed materials adversely
affected Starr in any way.  Although Starr asserts that he had
ongoing (and perhaps even contemplated additional) litigation at

the time, nothing in the record suggests the brief delay in getting those materials adversely affected that litigation.[6]

The remaining two _Turner_ factors can be addressed relatively briefly.  For the reasons discussed above, allowing inmates to receive voluminous mailings containing Internet printouts would place a substantial burden on the correctional officers charged with screening incoming inmate mail.  And, finally, as has been noted, the prison already accommodates inmates' exercise of the right Starr asserts: inmates are afforded access to computers through which they can obtain both statutory and regulatory materials.

Defendants' application of the prison's publisher's only rule was valid and reasonably related to legitimate penological interests.  As to count one of Starr's complaint, then, defendants are entitled to judgment as a matter of law.

---

[6]     In his complaint, Starr alleges that the computer "lockouts" which prevented him from accessing the statutory and regulatory materials lasted "for approximately three weeks." Complaint at para. 33.  Since the first time Starr claims to have encountered those lockouts was in November of 2003, it is reasonable to infer that he was able to use (or could have used) the prison's computers to obtain the materials in question at some point in December of 2003.  The mailing at the center of this dispute arrived at the prison on December 23, 2003.  Thus, it would certainly seem that the delay (if any) that Starr incurred in obtaining those materials was de minimus.

II.   <u>Count Two – Due Process</u>.

In count two of his complaint, Starr asserts that he was
deprived of due process, in violation of the Fourteenth
Amendment, because although "Defendants had a clearly established
policy outlining the manner of pre-deprivation review, [they]
failed to follow their own policy."  Complaint at para. 38.  At
this point, it is probably appropriate to note what Starr does
<u>not</u> claim: he "is not asserting a claim for the loss of the
physical printouts, but rather is asserting a claim of the denial
of his First Amendment right and due process right under the
Fourteenth Amendment, namely improper review and interference
with the right to appeal."  Plaintiff's memorandum (document no.
20-2) at 21.  <u>See generally</u> <u>Parratt v. Taylor</u>, 451 U.S. 527
(1981); <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422 (1982).


Specifically, Starr complains that prison policy provides
that the LRC shall be comprised of three members: "a
representative from security, mental health, and education."  PPD
5.26 IV(C).  And, says Starr, contrary to the policy directive,
the LRC that reviewed his materials was comprised of five
members, none of whom was from the education department.  <u>See</u>
Complaint at para. 41 ("There was no authorization in PPD 5.26 to
allow administrative personnel such as unit managers to sit on
the LRC.  The number [sitting on] the board was also against

16

policy.  The LRC, according to policy, is limited to three members.  The LRC in this instance had five security members sitting in review.  <u>Therefore, the members that sat on the LRC had no authority to sit, review, nor vote on the rejection of the material.  Where the LRC did not have authority to seat five security members, those members' actions were invalid.  Therefore, the Plaintiff was denied the due process</u> guaranteed to him <u>by the policy</u> governing the processing and review of his mail.") (emphasis supplied).

Contrary to Starr's suggestion, he was not denied his <u>constitutionally</u> protected right to procedural due process simply because the committee that convened to review incoming inmate mail (including Starr's) had five members, rather than three, or because it included representatives from the prison's administration, or because it lacked a member from the education department.  As the Supreme Court has observed:

> The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process.  Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.

<u>Zinermon v. Burch</u>, 494 U.S. 113, 126 (1990).

Here, the process the State provided was constitutionally adequate.  The mere fact that the composition of the LRC failed to comport precisely with prison regulations does not compel the conclusion that Starr was deprived of his constitutionally protected right to procedural due process.  The federal constitution does not prescribe a minimum standard for the composition of the prison's literary review committee and, in any event, the irregularity identified by Starr has not been shown, or even argued, to have adversely affected some substantive or material interest.  See generally Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454 (1989) (establishing a two-part test to resolve inmate due process claims).  See also Levine v. Torvik, 986 F.2d 1506, 1515 (6th Cir. 1993) ("A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable.").  Shango v. Jurich, 681 F.2d 1091, 1101 (7th Cir. 1982) ("Constitutionalizing every state procedural right would stand any due process analysis on its head.  Instead of identifying the substantive interest at stake and then ascertaining what process is due to the individual before he can be deprived of that interest, the process is viewed as a substantive end in itself.").

Starr's procedural due process claim is limited to the
composition of the LRC.  Nevertheless, the court notes,
parenthetically, that Starr's various appeals of the LRC's
decision to reject the printed materials may have been denied on
erroneous grounds.  It appears that prison officials (at each
level of the appellate process) mistakenly thought Starr had only
five <u>calendar</u> days to lodge his appeal, rather than five <u>business</u>
days (or, depending upon which PPD actually controlled, perhaps
as many as ten days).  Accordingly, those officials may have been
wrong when they deemed Starr's initial appeal to have been
untimely.  <u>See</u> note 2, <u>supra</u>.  But, even if Starr's grievance was
denied at each level of the administrative appeal process based
on incorrect reasoning, that fact alone would not give rise to a
viable procedural due process claim.  In other words, Starr was
not denied procedural due process simply because the individuals
addressing his various grievances and appeals arguably got it
wrong.  Under those circumstances, the only claim that Starr
might assert – though, for good reason, he does not raise it – is
that he was denied <u>substantive</u> due process.  But, even if he had
raised such a claim, it would not survive, given the undisputed
facts of record, and the absence of any conscious—shocking state
conduct.

III. <u>Retaliation</u>.

In the final count of his complaint, as implicitly amended by his legal memorandum, Starr asserts that defendant Coulombe "retaliated against the Plaintiff by refusing to deliver the mail in question when it initially arrived at the prison, and chose to have it reviewed by the LRC, and ultimately voted to reject it as a member of the LRC." Plaintiff's memorandum at 14. As this court recognized in one of Starr's earlier lawsuits:

> To prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation. Causation requires a showing that "but for the retaliatory motive the complained of incident . . . would not have occurred." <u>Johnson v. Rodriguez</u>, 110 F.3d 299, 310 (5th Cir. 1997) (quoting <u>Woods</u> <u>v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995)).

<u>Starr v. Dube</u>, 05-CV-264-SM, 2007 DNH 153 at 8 (D.N.H. Dec. 12, 2007) (quoting <u>McDonald v. Steward</u>, 132 F.3d 225, 231 (5th Cir. 1998)).

Here, even construing the record in the light most favorable to Starr, there is insufficient evidence from which a properly instructed, reasonable trier-of-fact could conclude that Coulombe's decision (as one member of the five-person LRC) to reject the printed materials under the Publisher's Only Rule was motivated by an intent to retaliate against Starr for having

previously litigated against the prison.  To be sure, Starr
points to Coulombe's knowledge of those prior suits as evidence
permitting an inference of a retaliatory motive.  He also
suggests that some material printed from the Internet was
actually delivered to him on other occasions, but says when
Coulombe saw that the materials at issue in this suit were <u>legal</u>
materials, he decided not to deliver them.[7]

Nevertheless, whatever inferences may be properly drawn from
such evidence, they are, as a matter of law, insufficient to
permit Starr's claims to go to a jury.  Among other things, Starr
has not pointed to any evidence which would support the causation
element of his claim.  That is, he has failed to point to any
evidence suggesting that the five-member LRC that was convened
would not have rejected his mail if Coulombe had not harbored a
discriminatory animus against him.

---

[7]     The relevance of the other Internet materials Starr
claims to have received is questionable.  As defendants point
out, "These [other Internet] printouts . . . only amount to 19
pages, which consist mostly of pictures (the pictures make it
easier to search the content for unauthorized material).  There
is no evidence that these were sent [to Starr] in early 2004, or
that they were sent together."  Defendants' reply memorandum
(document no. 24) at 3.  In other words, it is entirely possible
that those materials were delivered to Starr in groups of less
than ten pages and were, therefore, entirely consistent with the
new PPD governing Internet mailings.  Even if they were sent to
Starr <u>before</u> the PPD was amended, they are of sufficiently few
pages that it was not unreasonable for prison officials to review
them and pass them along to Starr, rather than withhold them as
too voluminous to search.

**Conclusion**

For the foregoing reasons, as well as those set forth in defendants' memoranda (documents no. 14-2, 19, and 24), the rejection (and eventual destruction) of the materials in question did not impose an unreasonable burden on Starr's First Amendment rights.  Nor was Starr's constitutionally protected right to procedural due process violated simply because the Literary Review Committee was not composed in precise accordance with prison administrative rules.  And, finally, the record establishes that Starr did not suffer any unlawful or unconstitutional retaliation for having previously brought litigation against prison officials.

On this record, it is plain that the slight delay Starr experienced in obtaining the statutory and regulatory materials he sought did not interfere with his pursuit of any state or federal litigation, whether pending or contemplated.  At most, Starr was minimally inconvenienced by the technical (and, based on the record evidence, entirely unintentional) computer problems that delayed his ability to acquire the materials in question. He was not, however, deprived of any constitutionally protected rights.

Plaintiff's motion for partial summary judgment (document no. 15) is denied, as is his motion for findings of fact (document no. 16).  Defendants' motion for summary judgment (document no. 14) is granted.  The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

January 29, 2009

cc:  Darren Starr, <u>pro</u> <u>se</u>
     John R. Lilly, Esq.
     John Vinson, Esq., NH DOC
     Nancy Smith, Esq., NH AG's Office

23